JUST and wife, Appellants, v. MARINETTE COUNTY, Respondent: STATE, Impleaded Respondent. [Case No. 106.]

MARINETTE COUNTY, Respondent, v. JUST and wife, Appellants: STATE, Impleaded Respondent. [Case No. 107.]

*Nos. 106, 107.   Argued September 11, 1972.—Decided October 31, 1972.*

(Also reported in 201 N. W. 2d 761.)

For the appellants there was a brief by *Evrard, Evrard, Duffy, Holman, Faulds and Peterson* and *Wayne R. Peterson*, all of Green Bay, and oral argument by *Wayne R. Peterson*.

For the respondent there was a brief by *James E. Murphy*, corporation counsel.

For the State (intervening pursuant to sec. 274.12 (6), Stats.) the cause was argued by *Steven M. Schur*, assistant attorney general, with whom on the brief was *Robert W. Warren*, attorney general.

A brief amicus curiae was filed by *McBurney, Musolf & Whipple, S.C.*, and *Carlyle H. Whipple*, all of Madison.

HALLOWS, C. J.   Marinette county's shoreland zoning ordinance number 24 was adopted September 19, 1967, became effective October 9, 1967, and follows a model ordinance published by the Wisconsin Department of Resource Development in July of 1967. *See* Kusler, *Water Quality Protection For Inland Lakes in Wisconsin: A Comprehensive Approach to Water Pollution*, 1970

Wis. L. Rev. 35, 62, 63. The ordinance was designed to meet standards and criteria for shoreland regulation which the legislature required to be promulgated by the department of natural resources under sec. 144.26, Stats. These standards are found in 6 Wis. Adm. Code, sec. NR 115.03, May, 1971, Register No. 185. The legislation, secs. 59.971 and 144.26, authorizing the ordinance was enacted as a part of the Water Quality Act of 1965 by ch. 614, Laws of 1965.

Shorelands for the purpose of ordinances are defined in sec. 59.971 (1), Stats., as lands within 1,000 feet of the normal high-water elevation of navigable lakes, ponds, or flowages and 300 feet from a navigable river or stream or to the landward side of the flood plain, whichever distance is greater. The state shoreland program is unique. All county shoreland zoning ordinances must be approved by the department of natural resources prior to their becoming effective. 6 Wis. Adm. Code, sec. NR 115.04, May, 1971, Register No. 185. If a county does not enact a shoreland zoning ordinance which complies with the state's standards, the department of natural resources may enact such an ordinance for the county. Sec. 59.971 (6).

There can be no disagreement over the public purpose sought to be obtained by the ordinance. Its basic purpose is to protect navigable waters and the public rights therein from the degradation and deterioration which results from uncontrolled use and development of shorelands. In the Navigable Waters Protection Act, sec. 144.26, Stats., the purpose of the state's shoreland regulation program is stated as being to "aid in the fulfillment of the state's role as trustee of its navigable waters and to promote public health, safety, convenience and general welfare." [1] In sec. 59.971 (1), which grants au-

---

[1] "144.26 Navigable waters protection law. (1) To aid in the fulfillment of the state's role as trustee of its navigable waters

thority for shoreland zoning to counties, the same purposes are reaffirmed.[2] The Marinette county shoreland zoning ordinance in secs. 1.2 and 1.3 states the uncontrolled use of shorelands and pollution of navigable waters of Marinette county adversely affect public health, safety, convenience, and general welfare and impair the tax base.

The shoreland zoning ordinance divides the shorelands of Marinette county into general purpose districts, general recreation districts, and conservancy districts. A "conservancy" district is required by the statutory minimum standards and is defined in sec. 3.4 of the ordinance to include "all shorelands designated as swamps or marshes on the United States geological survey maps which have been designated as the Shoreland Zoning Map of Marinette County, Wisconsin, or on the detailed Insert Shoreland Zoning Maps." The ordinance provides

and to promote public health, safety, convenience and general welfare, it is declared to be in the public interest to make studies, establish policies, make plans and authorize municipal shoreland zoning regulations for the efficient use, conservation, development and protection of this state's water resources. The regulations shall relate to lands under, abutting or lying close to navigable waters. The purposes of the regulations shall be to further the maintenance of safe and healthful conditions; prevent and control water pollution; protect spawning grounds, fish and aquatic life; control building sites, placement of structure and land uses and reserve shore cover and natural beauty."

[2] "59.971 **Zoning of shorelands on navigable waters.** (1) To effect the purposes of s. 144.26 and to promote the public health, safety and general welfare, counties may, by ordinance enacted separately from ordinances pursuant to s. 59.97, zone all lands (referred to herein as shorelands) in their unincorporated areas within the following distances from the normal high-water elevation of navigable waters as defined in s. 144.26 (2) (d): 1,000 feet from a lake, pond or flowage; 300 feet from a river or stream or to the landward side of the flood plain, whichever distance is greater. If the navigable water is a glacial pothole lake, the distance shall be measured from the high watermark thereof."

for permitted uses [3] and conditional uses.[4] One of the conditional uses requiring a permit under sec. 3.42 (4) is the filling, drainage or dredging of wetlands according to the provisions of sec. 5.0 of the ordinance. "Wetlands" are defined in sec. 2.29 as "[a]reas where ground water is at or near the surface much of the year or where any segment of plant cover is deemed an aquatic according to N. C. Fassett's 'Manual of Aquatic Plants.'" Sec. 5.42 (2) of the ordinance requires a conditional use permit for any filling or grading "Of any area which is within three hundred feet horizontal distance of a navigable water and which has surface drainage toward the water

[3] "3.41 **Permitted Uses.**

"(1) Harvesting of any wild crop such as marsh hay, ferns, moss, wild rice, berries, tree fruits and tree seeds.

"(2) Sustained yield forestry subject to the provisions of Section 5.0 relating to removal of shore cover.

"(3) Utilities such as, but not restricted to, telephone, telegraph and power transmission lines.

"(4) Hunting, fishing, preservation of scenic, historic and scientific areas and wildlife preserves.

"(5) Non-resident buildings used solely in conjunction with raising water fowl, minnows, and other similar lowland animals, fowl or fish.

"(6) Hiking trails and bridle paths.

"(7) Accessory uses.

"(8) Signs, subject to the restriction of Section 2.0."

[4] "3.42 **Conditional Uses.** The following uses are permitted upon issuance of a Conditional Use Permit as provided in Section 9.0 and issuance of a Department of Resource Development permit where required by Section 30.11, 30.12, 30.19, 30.195 and 31.05 of the Wisconsin Statutes.

"(1) General farming provided farm animals shall be kept one hundred feet from any non-farm residence.

"(2) Dams, power plants, flowages and ponds.

"(3) Relocation of any water course.

"(4) Filling, drainage or dredging of wetlands according to the provisions of Section 5.0 of this ordinance.

"(5) Removal of topsoil or peat.

"(6) Cranberry bogs.

"(7) Piers, docks, boathouses."

and on which there is: (a) Filling of more than five hundred square feet of any wetland which is contiguous to the water . . . (d) Filling or grading of more than 2,000 square feet on slopes of twelve percent or less."

In April of 1961, several years prior to the passage of this ordinance, the Justs purchased 36.4 acres of land in the town of Lake along the south shore of Lake Noquebay, a navigable lake in Marinette county. This land had a frontage of 1,266.7 feet on the lake and was purchased partially for personal use and partially for resale. During the years 1964, 1966, and 1967, the Justs made five sales of parcels having frontage and extending back from the lake some 600 feet, leaving the property involved in these suits. This property has a frontage of 366.7 feet and the south one half contains a stand of cedar, pine, various hardwoods, birch and red maple. The north one half, closer to the lake, is barren of trees except immediately along the shore. The south three fourths of this north one half is populated with various plant grasses and vegetation including some plants which N. C. Fassett in his manual of aquatic plants has classified as "aquatic." There are also nonaquatic plants which grow upon the land. Along the shoreline there is a belt of trees. The shoreline is from one foot to 3.2 feet higher than the lake level and there is a narrow belt of higher land along the shore known as a "pressure ridge" or "ice heave," varying in width from one to three feet. South of this point, the natural level of the land ranges one to two feet above lake level. The land slopes generally toward the lake but has a slope less than 12 percent. No water flows onto the land from the lake, but there is some surface water which collects on land and stands in pools.

The land owned by the Justs is designated as swamps or marshes on the United States Geological Survey Map and is located within 1,000 feet of the normal high-water

elevation of the lake. Thus, the property is included in a conservancy district and, by sec. 2.29 of the ordinance, classified as "wetlands." Consequently, in order to place more than 500 square feet of fill on this property, the Justs were required to obtain a conditional use permit from the zoning administrator of the county and pay a fee of $20 or incur a forfeiture of $10 to $200 for each day of violation.

In February and March of 1968, six months after the ordinance became effective, Ronald Just, without securing a conditional use permit, hauled 1,040 square yards of sand onto this property and filled an area approximately 20 feet wide commencing at the southwest corner and extending almost 600 feet north to the northwest corner near the shoreline, then easterly along the shoreline almost to the lot line. He stayed back from the pressure ridge about 20 feet. More than 500 square feet of this fill was upon wetlands located contiguous to the water and which had surface drainage toward the lake. The fill within 300 feet of the lake also was more than 2,000 square feet on a slope less than 12 percent. It is not seriously contended that the Justs did not violate the ordinance and the trial court correctly found a violation.

The real issue is whether the conservancy district provisions and the wetlands-filling restrictions are unconstitutional because they amount to a constructive taking of the Justs' land without compensation. Marinette county and the state of Wisconsin argue the restrictions of the conservancy district and wetlands provisions constitute a proper exercise of the police power of the state and do not so severely limit the use or depreciate the value of the land as to constitute a taking without compensation.

To state the issue in more meaningful terms, it is a conflict between the public interest in stopping the

despoliation of natural resources, which our citizens until recently have taken as inevitable and for granted, and an owner's asserted right to use his property as he wishes. The protection of public rights may be accomplished by the exercise of the police power unless the damage to the property owner is too great and amounts to a confiscation. The securing or taking of a benefit not presently enjoyed by the public for its use is obtained by the government through its power of eminent domain. The distinction between the exercise of the police power and condemnation has been said to be a matter of degree of damage to the property owner. In the valid exercise of the police power reasonably restricting the use of property, the damage suffered by the owner is said to be incidental. However, where the restriction is so great the landowner ought not to bear such a burden for the public good, the restriction has been held to be a constructive taking even though the actual use or forbidden use has not been transferred to the government so as to be a taking in the traditional sense. *Stefan Auto Body v. State Highway Comm.* (1963), 21 Wis. 2d 363, 124 N. W. 2d 319; *Buhler v. Racine County* (1966), 33 Wis. 2d 137, 146 N. W. 2d 403; *Nick v. State Highway Comm.* (1961), 13 Wis. 2d 511, 109 N. W. 2d 71; *State v. Becker* (1934), 215 Wis. 564, 255 N. W. 144. Whether a taking has occurred depends upon whether "the restriction practically or substantially renders the land useless for all reasonable purposes." *Buhler v. Racine County, supra.* The loss caused the individual must be weighed to determine if it is more than he should bear. As this court stated in *Stefan,* at pages 369, 370, ". . . if the damage is such as to be suffered by many similarly situated and is in the nature of a restriction on the use to which land may be put and ought to be borne by the individual as a member of society for the good of the public safety, health, or general welfare, it is said to

be a reasonable exercise of the police power, but if the damage is so great to the individual that he ought not to bear it under contemporary standards, then courts are inclined to treat it as a 'taking' of the property or an unreasonable exercise of the police power."

Many years ago, Professor Freund stated in his work on *The Police Power*, sec. 511, at 546, 547, ". . . it may be said that the state takes property by eminent domain because it is useful to the public, and under the police power because it is harmful . . . . From this results the difference between the power of eminent domain and the police power, that the former recognizes a right to compensation, while the latter on principle does not." Thus the necessity for monetary compensation for loss suffered to an owner by police power restriction arises when restrictions are placed on property in order to create a public benefit rather than to prevent a public harm. 1 Rathkopf, *The Law of Zoning and Planning*, ch. 6, p. 6–7.

This case causes us to re-examine the concepts of public benefit in contrast to public harm and the scope of an owner's right to use of his property. In the instant case we have a restriction on the use of a citizens' property, not to secure a benefit for the public, but to prevent a harm from the change in the natural character of the citizens' property. We start with the premise that lakes and rivers in their natural state are unpolluted and the pollution which now exists is man made. The state of Wisconsin under the trust doctrine has a duty to eradicate the present pollution and to prevent further pollution in its navigable waters. This is not, in a legal sense, a gain or a securing of a benefit by the maintaining of the natural *status quo* of the environment. What makes this case different from most condemnation or police power zoning cases is the interrelationship of the wetlands, the swamps and the natural environment of shorelands to

the purity of the water and to such natural resources as navigation, fishing, and scenic beauty. Swamps and wetlands were once considered wasteland, undesirable, and not picturesque. But as the people became more sophisticated, an appreciation was acquired that swamps and wetlands serve a vital role in nature, are part of the balance of nature and are essential to the purity of the water in our lakes and streams. Swamps and wetlands are a necessary part of the ecological creation and now, even to the uninitiated, possess their own beauty in nature.

Is the ownership of a parcel of land so absolute that man can change its nature to suit any of his purposes? The great forests of our state were stripped on the theory man's ownership was unlimited. But in forestry, the land at least was used naturally, only the natural fruit of the land (the trees) were taken. The despoilage was in the failure to look to the future and provide for the reforestation of the land. An owner of land has no absolute and unlimited right to change the essential natural character of his land so as to use it for a purpose for which it was unsuited in its natural state and which injures the rights of others. The exercise of the police power in zoning must be reasonable and we think it is not an unreasonable exercise of that power to prevent harm to public rights by limiting the use of private property to its natural uses.

This is not a case where an owner is prevented from using his land for natural and indigenous uses. The uses consistent with the nature of the land are allowed and other uses recognized and still others permitted by special permit. The shoreland zoning ordinance prevents to some extent the changing of the natural character of the land within 1,000 feet of a navigable lake and 300 feet of a navigable river because of such land's interrelation to the contiguous water. The changing of wet-

lands and swamps to the damage of the general public by upsetting the natural environment and the natural relationship is not a reasonable use of that land which is protected from police power regulation. Changes and filling to some extent are permitted because the extent of such changes and filling does not cause harm. We realize no case in Wisconsin has yet dealt with shoreland regulations and there are several cases in other states which seem to hold such regulations unconstitutional; but nothing this court has said or held in prior cases indicates that destroying the natural character of a swamp or a wetland so as to make that location available for human habitation is a reasonable use of that land when the new use, although of a more economical value to the owner, causes a harm to the general public.

Wisconsin has long held that laws and regulations to prevent pollution and to protect the waters of this state from degradation are valid police-power enactments. *State ex rel. Martin v. Juneau* (1941), 238 Wis. 564, 300 N. W. 187; *State ex rel. La Follette v. Reuter* (1967), 33 Wis. 2d 384, 147 N. W. 2d 304; *Reuter v. Department of Natural Resources* (1969), 43 Wis. 2d 272, 168 N. W. 2d 860. The active public trust duty of the state of Wisconsin in respect to navigable waters requires the state not only to promote navigation but also to protect and preserve those waters for fishing, recreation, and scenic beauty. *Muench v. Public Service Comm.* (1952), 261 Wis. 492, 53 N. W. 2d 514, 55 N. W. 2d 40. To further this duty, the legislature may delegate authority to local units of the government, which the state did by requiring counties to pass shoreland zoning ordinances. *Menzer v. Elkhart Lake* (1971), 51 Wis. 2d 70, 186 N. W. 2d 290.

This is not a case of an isolated swamp unrelated to a navigable lake or stream, the change of which would cause no harm to public rights. Lands adjacent to or near navigable waters exist in a special relationship to the state. They have been held subject to special taxation,

*Soens v. Racine* (1860), 10 Wis. 214 (*271), and are subject to the state public trust powers, *Wisconsin Power & Light Co. v. Public Service Comm.* (1958), 5 Wis. 2d 167, 92 N. W. 2d 241; and since the Laws of 1935, ch. 303, counties have been authorized to create special zoning districts along waterways and zone them for restrictive conservancy purposes.[5] The restrictions in the Marinette county ordinance upon wetlands within 1,000 feet of Lake Noquebay which prevent the placing of excess fill upon such land without a permit is not confiscatory or unreasonable.

Cases wherein a confiscation was found cannot be relied upon by the Justs. In *State v. Herwig* (1962), 17 Wis. 2d 442, 117 N. W. 2d 335, a "taking" was found where a regulation which prohibited hunting on farmland had the effect of establishing a game refuge and resulted in an unnatural, concentrated foraging of the owner's land by waterfowl. In *State v. Becker, supra,* the court held void a law which established a wildlife refuge (and prohibited hunting) on private property. In *Benka v. Consolidated Water Power Co.* (1929), 198 Wis. 472, 224 N. W. 718, the court held if damages to plaintiff's property were in fact caused by flooding from a dam constructed by a public utility, those damages constituted a "taking" within the meaning of the condemnation statutes. In *Bino v. Hurley* (1956), 273 Wis. 10, 76 N. W. 2d 571, the court held unconstitutional as a "taking" without compensation an ordinance which, in attempting to prevent pollution, prohibited the owners of land surrounding a lake from bathing, boating, or swimming in the lake. In *Piper v. Ekern* (1923), 180 Wis. 586, 593,

[5] In *Jefferson County v. Timmel* (1952), 261 Wis. 39, 51 N. W. 2d 518, the constitutionality of a conservancy district use restriction was upheld as being based on a valid exercise of police power. The purpose for this conservancy district, however, was for highway safety and not for the prevention of pollution and the protection of the public trust in navigable waters.

194 N. W. 159, 162, the court held a statute which limited the height of buildings surrounding the state capitol to be unnecessary for the public health, safety, or welfare and, thus, to constitute an unreasonable exercise of the police power. In all these cases the unreasonableness of the exercise of the police power lay in excessive restriction of the natural use of the land or rights in relation thereto.

Cases holding the exercise of police power to be reasonable likewise provide no assistance to Marinette county in their argument. In *More-Way North Corp. v. State Highway Comm.* (1969), 44 Wis. 2d 165, 170 N. W. 2d 749, the court held that no "taking" occurred as a result of the state's lowering the grade of a highway, which necessitated plaintiff's reconstruction of its parking lot and loss of 42 parking spaces. In *Wisconsin Power & Light Co. v. Columbia County* (1958), 3 Wis. 2d 1, 87 N. W. 2d 279, no "taking" was found where the county, in relocating a highway, deposited gravel close to plaintiff's tower, causing it to tilt. In *Nick v. State Highway Comm., supra,* the court held where property itself is not physically taken by the state, a restriction of access to a highway, while it may decrease the value of the land, does not entitle the owner to compensation. In *Buhler* the court held the mere depreciation of value was not sufficient ground to enjoin the county from enforcing the ordinance. In *Hasslinger v. Hartland* (1940), 234 Wis. 201, 206, 290 N. W. 647, the court noted that "[a]ssuming an actionable nuisance by the creation of odors which make occupation of plaintiffs' farm inconvenient . . . and impair its value, it cannot be said that defendant has dispossessed plaintiffs or taken their property."

The Justs rely on several cases from other jurisdictions which have held zoning regulations involving flood plain districts, flood basins and wetlands to be so confiscatory as to amount to a taking because the owners of the land

were prevented from improving such property for residential or commercial purposes. While some of these cases may be distinguished on their facts, it is doubtful whether these differences go to the basic rationale which permeates the decision that an owner has a right to use his property in any way and for any purpose he sees fit. In *Dooley v. Town Plan & Zoning Comm.* (1964), 151 Conn. 304, 197 Atl. 2d 770, the court held the restriction on land located in a flood plain district prevented its being used for residential or business purposes and thus the restriction destroyed the economic value to the owner. The court recognized the land was needed for a public purpose as it was part of the area in which the tidal stream overflowed when abnormally high tides existed, but the property was half a mile from the ocean and therefore could not be used for marina or boathouse purposes. In *Morris County Land Improvement Co. v. Parsippany-Troy Hills Township* (1963), 40 N. J. 539, 193 Atl. 2d 232, a flood basin zoning ordinance was involved which required the controversial land to be retained in its natural state. The plaintiff owned 66 acres of a 1,500-acre swamp which was part of a river basin and acted as a natural detention basin for flood waters in times of very heavy rainfall. There was an extraneous issue that the freezing regulations were intended as a stopgap until such time as the government would buy the property under a flood-control project. However, the court took the view the zoning had an effect of preserving the land as an open space as a water-detention basin and only the government or the public would be benefited, to the complete damage of the owner.

In *State v. Johnson* (Me. 1970), 265 Atl. 2d 711, the Wetlands Act restricted the alteration and use of certain wetlands without permission. The act was a conservation measure enacted under the police power to protect the ecology of areas bordering the coastal waters. The plain-

tiff owned a small tract of a saltwater marsh which was flooded at high tide. By filling, the land would be adapted for building purposes. The court held the restrictions against filling constituted a deprivation of a reasonable use of the owner's property and, thus, an unreasonable exercise of the police power. In *MacGibbon v. Board of Appeals of Duxbury* (1970), 356 Mass. 635, 255 N. E. 2d 347, the plaintiff owned seven acres of land which were under water about twice a month in a shoreland area. He was denied a permit to excavate and fill part of his property. The purpose of the ordinance was to preserve from despoilage natural features and resources such as salt marshes, wetlands, and ponds. The court took the view the preservation of privately owned land in its natural, unspoiled state for the enjoyment and benefit of the public by preventing the owner from using it for any practical purpose was not within the limit and scope of the police power and the ordinance was not saved by the use of special permits.

It seems to us that filling a swamp not otherwise commercially usable is not in and of itself an existing use, which is prevented, but rather is the preparation for some future use which is not indigenous to a swamp. Too much stress is laid on the right of an owner to change commercially valueless land when that change does damage to the rights of the public. It is observed that a use of special permits is a means of control and accomplishing the purpose of the zoning ordinance as distinguished from the old concept of providing for variances. The special permit technique is now common practice and has met with judicial approval, and we think it is of some significance in considering whether or not a particular zoning ordinance is reasonable.

A recent case sustaining the validity of a zoning ordinance establishing a flood plain district is *Turnpike Realty Co. v. Town of Dedham* (Mass. 1972), 284 N. E. 2d

891. The court held the validity of the ordinance was supported by valid considerations of public welfare, the conservation of "natural conditions, wildlife and open spaces." The ordinance provided that lands which were subject to seasonal or periodic flooding could not be used for residences or other purposes in such a manner as to endanger the health, safety or occupancy thereof and prohibited the erection of structures or buildings which required land to be filled. This case is analogous to the instant facts. The ordinance had a public purpose to preserve the natural condition of the area. No change was allowed which would injure the purposes sought to be preserved and through the special permit technique, particular land within the zoning district could be excepted from the restrictions.

The Justs argue their property has been severely depreciated in value. But this depreciation of value is not based on the use of the land in its natural state but on what the land would be worth if it could be filled and used for the location of a dwelling. While loss of value is to be considered in determining whether a restriction is a constructive taking, value based upon changing the character of the land at the expense of harm to public rights is not an essential factor or controlling.

We are not unmindful of the warning in *Pennsylvania Coal Co. v. Mahon* (1922), 260 U. S. 393, 416, 43 Sup. Ct. 158, 67 L. Ed. 322:

". . . We are in danger of forgetting that a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."

This observation refers to the improvement of the public condition, the securing of a benefit not presently enjoyed and to which the public is not entitled. The shoreland zoning ordinance preserves nature, the environment, and natural resources as they were created and to which the

people have a present right.[6] The ordinance does not create or improve the public condition but only preserves nature from the despoilage and harm resulting from the unrestricted activities of humans.

We note the lower court dismissed the action commenced by the Justs, although it sought a declaratory judgment and the rights of the Justs were declared. This dismissal is in conflict with the procedure which this court has made clear should be followed, namely, that the complaint should not be dismissed when contrary to the plaintiffs' contention, but rather the judgment should set forth the declaratory adjudication. *City of Milwaukee v. Milwaukee County* (1965), 27 Wis. 2d 53, 67, 133 N. W. 2d 393; *David A. Ulrich, Inc. v. Saukville* (1959), 7 Wis. 2d 173, 181, 96 N. W. 2d 612; *Denning v. Green Bay* (1955), 271 Wis. 230, 72 N. W. 2d 730.

In commenting on the propriety of its deciding the issue of constitutionality of the ordinance, the trial court quoted *State v. Stehlek* (1953), 262 Wis. 642, 645, 56 N. W. 2d 514:

"The exercise of the power to declare laws unconstitutional by inferior courts should be carefully limited and avoided if possible. The authorities are to the effect that unless it appears clearly beyond a reasonable doubt that the statute is unconstitutional, it is considered better practice for the court to assume the statute is constitutional, until the contrary is decided by a court of appellate jurisdiction."

This view has consistently been followed. *State ex rel. Fieldhack v. Gregorski* (1956), 272 Wis. 570, 574, 76 N. W. 2d 382; *White House Milk Co. v. Reynolds* (1960),

---

[6] On the letterhead of the Jackson County Zoning and Sanitation Department, the following appears: "The land belongs to the people . . . a little of it to those dead . . . some to those living . . . but most of it belongs to those yet to be born. . ."

12 Wis. 2d 143, 106 N. W. 2d 441; *Associated Hospital Service v. Milwaukee* (1961), 13 Wis. 2d 447, 474, 109 N. W. 2d 271; *City of Milwaukee v. Hoffmann* (1965), 29 Wis. 2d 193, 198, 138 N. W. 2d 223. In *Gregorski* the district court of Milwaukee held a statute constitutional and we affirmed the holding of constitutionality by the circuit court when it denied a writ of prohibition. We pointed out the above language did not justify an inference the trial court could not pass upon the constitutionality of a statute. In *White House* we reversed the circuit court's holding of unconstitutionality and quoted the *Stehlek Case* without comment. In *Associated Hospital* the circuit court denied summary judgment on the ground the constitutionality question required hearing evidence. We recognized the circuit court's power to decide the issue and stated we were hesitant "to lay down any rule governing the exercise of discretion by trial courts, when confronted with an issue of constitutionality of a statute on demurrer or motion for summary judgment . . ." but stated "it is better practice for it to assume the statute is constitutional until the appellate court has passed upon it except where unconstitutionality is apparent beyond a reasonable doubt." (p. 474) In *Hoffmann* we affirmed the circuit court which reversed the county court in holding a city ordinance unconstitutional and pointed out the county court had decided a question of constitutionality when one party was not represented by counsel, the other side had stated it was not ready for trial, without the benefit of briefs and without giving a written reason for the holding.

Although the practice for trial courts not to hold laws unconstitutional has not been uniformly followed, nevertheless, it is our belief many lawyers have been and are bringing to the federal courts cases involving questions of constitutionality of state laws because of the limitation

placed on state courts in the exercise of the power to declare a law unconstitutional.

We think that when a constitutional issue is now presented to the trial courts of this state, it is the better practice for those courts to recognize its importance, have the issue thoroughly briefed, and fully presented. The issue should be decided as any other important issue with due consideration. The practice of assuming constitutionality, until the contrary is decided by an appellate court, is no longer necessary or workable. Of course, a presumption of constitutionality exists until declared otherwise by a competent court, which we think the trial courts of Wisconsin are, because a regularly enacted statute is presumed to be constitutional and the party attacking the statute must meet the burden of proof of showing unconstitutionality beyond a reasonable doubt.

*By the Court.*—The judgment in Case No. 106, dismissing the Justs' action, is modified to set forth the declaratory adjudication that the shoreland zoning ordinance of respondent Marinette county is constitutional; that the Justs' property constitutes wetlands and that particularly the prohibition in the ordinance against the filling of wetlands is constitutional; and the judgment, as so modified, is affirmed. The judgment in Case No. 107, declaring a forfeiture, is affirmed.